IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARYLAND JOCKEY CLUB et al.          :
                                     :
v.                                   :   Civil No. WMN-03-2124
                                     :
ODS TECHNOLOGIES, L.P.               :

**MEMORANDUM**

Plaintiffs The Maryland Jockey Club of Baltimore City, Inc., Laurel Racing Association, Inc., and Laurel Racing Association Limited Partnership (collectively "MJC"), filed a complaint on July 21, 2003, against ODS Technologies, L.P. (ODS or ODST) seeking a declaratory judgment and specific performance of a pair of virtually identical contracts previously negotiated between the parties (the Founders Agreement(s)).  ODS filed an answer and counterclaim for breach of contract against MJC and also asserted third-party claims against Magna Entertainment Corp. (Magna) for tortious interference with contractual relations.  MJC and Magna have moved for summary judgment.  Paper No. 97.  ODS has opposed the motion and included its own cross-motion for partial summary judgment.  Paper No. 102.  The motions are fully briefed and ripe for decision.[1]  Upon a review of the motions

_____

[1]  Also pending before the Court are MJC and Magna's motion to re-open discovery, Paper No. 119, and ODS's motion to seal certain exhibits, Paper No. 101.  These motions will be resolved in a separate opinion.

and the applicable case law, the Court determines that no
hearing is necessary (Local Rule 105.6) and that MJC and
Magna's motion will be granted in part and denied in part and
ODS's motion will be denied.

## I.  FACTUAL BACKGROUND

The contract at issue between ODS and MJC evolved over
several years.  On December 11, 1997, ODS and MJC entered into
the original Founders Agreement that governs their
relationship as to ODS's rights to broadcast and accept wagers
on live horse races at Pimlico and Laurel Park race tracks on
ODS's interactive television and wagering network, known as
TVG.  See December 30, 2003, Mem. at 2-3 (recounting factual
background).  The Founders Agreement has been amended several
times: by an August 1997 letter agreement; in December 1998,
by Amendment Agreement No. 1; and by a May 1999 letter
agreement.  ODS claims that the agreement was further amended
in May 2001 by MJC's oral waiver of certain performance
milestones, which relate to the amount of money being wagered.
MJC did not respond, however, to ODS's three subsequent
requests, made in May, June, and August 2001, for a written
waiver of these milestones.

Several provisions of the contract are relevant to the
resolution of these motions.  Some provisions call for MJC to:

(1) grant ODS an exclusive license for broadcasting certain MJC races after ODS enters the Maryland market; (2) not compete with ODS; (3) not discuss the sale of interactive wagering capabilities with others; (4) maintain the confidentiality of ODS's proprietary information; and (5) not assign any rights or obligations.  Another section provides a set of performance milestones for ODS to achieve by certain dates.  The contract further stipulates that all waivers must be signed and that MJC will earn a one-sixth of one percent interest in ODS each time one of three specific goals is achieved.

ODS and Magna are competitors in the gaming industry. Both have entered numerous contracts throughout the United States to purchase horse racing content from various tracks. They came into conflict here over their respective efforts to control MJC's broadcast signals.  At all times during the life of the Founders Agreement, MJC shared its broadcast signals with other account wagering outlets.

In October 2001, Magna received a request for bids to purchase MJC and on March 5, 2002, submitted a non-binding letter of intent to purchase a controlling interest of MJC stock.  Magna read the Founders Agreement before sending its letter of intent and then, in conducting its due diligence,

extensively reviewed MJC's files, which contained ODS's confidential proprietary information. By November 2002, Magna had completed the stock purchase. Under the purchase agreement, Magna agreed to indemnify MJC for any costs associated with litigation by ODS against MJC for breach of the Founders Agreement.

In 2003, the relationship between MJC and ODS rapidly deteriorated. In January 2003, MJC complained to ODS of its failure to meet the performance milestones outlined in the Founders Agreement. In July 2003, MJC sent ODS a notice of its intent to terminate the Founders Agreement, triggering the instant litigation. MJC filed its complaint in this Court seeking a declaratory judgment and injunctive relief to enforce the milestone provisions of the Founders Agreement against ODS; ODS counter-claimed for contract breach by MJC and added third-party claims against Magna for, _inter alia_, tortious interference with contract.

On December 30, 2003, this Court granted MJC and Magna's motion to dismiss the tortious interference claims against Magna because the allegations at that time only concerned Magna's conduct as MJC's parent company. At the conclusion of a full hearing on February 13, 2004, this Court also denied ODS's motion for a preliminary injunction to compel MJC to

4

provide the disputed broadcast feed exclusively to ODS.  The following day, MJC terminated the Founders Agreement.  On July 13, 2004, however, this Court granted ODS's motion to amend its counterclaim to allege tortious interference with contract by Magna based on Magna's actions prior to its purchase of MJC.

## II.  LEGAL STANDARD

A moving party is entitled to summary judgment only upon showing that there exists no genuine issue as to any material fact, and it is entitled to judgment as a matter of law.  <u>See</u> F<span>ED</span>. R. C<span>IV</span>. P. 56(c); <u>Blue Ridge Ins. Co. v. Puig</u>, 64 F. Supp. 2d 514 (D. Md. 1999) (<u>citing</u>, <u>inter alia</u>, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)).

"Where . . . both parties have moved for summary judgment, it does not establish that there is no issue of fact and require that summary judgment be granted to one side or another."  <u>World-Wide Rights Ltd. P'ship v. Combe, Inc.</u>, 955 F.2d 242, 244 (4th Cir. 1992) (citation and internal quotation marks omitted).  When both parties file motions for summary judgment, the court applies the same standards of review. <u>Taft Broadcasting Co. v. United States</u>, 929 F.2d 240, 248 (6th Cir. 1991); <u>ITCO Corp. v. Michelin Tire Corp.</u>, 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve

genuine issues of material facts on a motion for summary judgment--even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted), <u>cert. denied</u>, 469 U.S. 1215 (1985).  The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard."  <u>Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.</u>, 627 F. Supp. 170, 172 (D. Md. 1985)(quoting Wright, Miller & Kane, <u>Federal Practice and Procedure: Civil 2d</u> § 2720).

## III.  DISCUSSION

### A.  Applicable law

Because the Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332, it applies Maryland's choice of law rules to the contract and tort claims.  <u>See Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941).  Maryland's choice of law rules allow for contracting parties to "agree as to the law which will govern their transaction, even as to issues going to the validity of the contract."  <u>Nat'l Glass, Inc. v. J.C. Penney Properties, Inc.</u>, 650 A.2d 246, 248 (Md. 1994).  Here, the parties agreed that Delaware law governs the contract.  For tort claims, Maryland generally "adheres to the choice of law rule of <u>lex loci</u>

delecti, or place of harm, to determine the applicable law . . . ." CompuSpa, Inc. v. Int'l. Bus. Machines Corp., 228 F. Supp. 2d 613, 619 (D. Md. 2002) (citing Philip Morris Inc. v. Angeletti, 752 A.2d 200, 231 (Md. 2000)).  ODS asserts that Maryland is where it has been harmed and MJC and Magna do not dispute that.  Therefore, the breach of contract claims will be resolved under Delaware law and the tortious interference with contract claims will be resolved under Maryland law.

### B. Breach of contract by MJC

ODS moves for summary judgment against MJC for breach of contract and points to the following provisions in the Founders Agreement as breached: the exclusivity clause (Section 3.1); the non-compete clause (Section 3.2(e)-(f)); the anti-assignment clause (Section 9.3); and the confidentiality provisions of Article VIII.  MJC asserts it is entitled to summary judgment on the same.  The Court addresses each provision in turn to determine if there are genuine disputes of material fact that would make summary adjudication improper.

### 1. Section 3.1 (Exclusivity)

Proper construction of Section 3.1 requires interpretation of Article VI as well.  Section 3.1, inter alia, grants ODS an exclusive license to use the broadcast of

certain MJC races "[s]ubject to achieving the Milestones described in [certain provisions in Article VI.]"[2]  Under one of those provisions, Section 6.6 of the Amendment Agreement, ODS agrees to exert reasonable efforts to secure by November 1, 2001, a "three-month rolling average of Gross Simulcast Wagering [of] Two Hundred Thirty Million Dollars ($230,000,000) going forward."  ODS further agreed to "provide MJC with reasonable evidence of ODST's achievement of, or notice of its failure to achieve, the Milestones . . . ."

Article VI includes specific notice provisions.  In these, ODS agreed that failure to achieve any of the relevant milestones would allow "MJC without liability to ODST [to] terminate this Agreement effective upon notice by MJC to ODST which notice must be given within fifteen (15) days after MJC has received notice of the failure to achieve a particular Milestone . . . ."  Article VI also allows for a ninety day cure period.  The record is clear that ODS did not meet the $230,000,000 milestone by November 1, 2001, or anytime thereafter.

The parties contest the relevance and proper construction of the Article VI milestones on many fronts.  ODS argues that

---

[2]  In April 1999, the Article VI Milestones were renumbered by Amendment Agreement No. 1.

the milestones were orally waived in their entirety by MJC in May 2001.  Alternatively, ODS argues that, even if the milestones were operable after May 2001, MJC also waived them by failing to terminate the agreement within the contractually required 15-day time frame.  ODS stresses that MJC did not raise the milestone issue until January 2003 and did not give notice of its intent to terminate until June 2003.  MJC and Magna, however, argue that ODS never earned the exclusivity rights upon which its claims depend.  MJC and Magna also argue that the Section 6.6 milestone's "going forward" language made that provision an "evergreen clause," which perpetually obligated ODS to meet the $230,000,000 volume and entitled MJC to terminate the contract at will any time after November 2001, provided that it did so within 15 days of receiving notice from ODS and ODS did not cure the breach.

Because the facts surrounding each of MJC's alleged waivers (orally in May 2001 and by subsequent non-compliance with the notice provisions of Article VI) of the milestones are disputed, summary judgment is not proper on the alleged breach of the exclusivity clause.  In contract actions, summary judgment is generally not appropriate where the state of mind of a contracting party is at issue.  See WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 2730.1 (1998)

(noting impropriety of summary judgment where "ambiguities in the contract prevent the resolution of questions such as whether the conduct of one of the parties should be deemed to have waived some of the contract rights").  ODS emphatically asserts, through the sworn testimony of its former CEO, Mark Wilson, that MJC orally waived Article VI entirely in May 2001.  MJC and Magna maintain MJC did not.  The parties also dispute whether MJC received notice of ODS's failure to meet the milestone more than 15 days before MJC sent its termination notice.  These are clear disputes of material fact, which make summary judgment improper.

MJC and Magna argue that because the contract requires that all amendments be written, ODS's assertions of oral waiver, even if accurate, are insufficient to withstand MJC and Magna's summary judgment motion as a matter of law. Delaware law, however, holds that "[t]he prohibition against amendment except by written change may be waived or modified in the same way in which any other provision of a written agreement may be waived or modified, including a change in the provisions of the written agreement by the course of conduct of the parties."  Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc., 297 A.2d 28, 33 (Del. 1972).  Considering that "[i]ntention forms the foundation of the doctrine of waiver,"

Delaware law considers "[s]ummary judgment . . . inappropriate where . . . the inference or ultimate fact to be established concerns intent or other subjective reactions." <u>George v. Frank A. Robino, Inc.</u>, 334 A.2d 223, 224 (Del. 1975); <u>see also AeroGlobal Capital Mgmt., LLC v. Cirrus Industries, Inc.</u>, --- A.2d ---, 2005 WL 774844 (Del. March 23, 2005) (reversing summary judgment for defendant, where lower court found defendant did not waive, because record at summary judgment demonstrated that a factfinder could permissibly have drawn the inference that defendant had waived).  If the factfinder here finds credible the testimony that MJC orally waived Article VI, it could permissibly draw the inference that a legal waiver occurred.

The ambiguity of the "going forward" language also makes summary judgment inappropriate.  ODS asserts that MJC's opportunity to terminate the agreement pursuant to the milestones elapsed long before it initiated termination.  MJC asserts that the ambiguous language must be construed against ODS and that this Court has already essentially found the same language gave MJC a continuing power to terminate the agreement.

The Fourth Circuit provides clear guidance on the appropriateness of summary judgment in the interpretation of

11

an ambiguous contract term.  See World-Wide Rights Ltd. P'ship
v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992).  It directs
that a district court may grant summary judgment on the basis
of extrinsic evidence within the summary judgment materials
"if that evidence is, as a matter of law, dispositive of the
interpretive issue . . . ."  Id. (citation omitted).  It
immediately adds, however, that where "resort to extrinsic
evidence in the summary judgment materials leaves genuine
issues of fact respecting the contract's proper
interpretation, summary judgment must of course be refused and
interpretation left to the trier of fact."  Id.  While it is
true that at the February 2004 preliminary injunction hearing
the Court commented on the ambiguity of the contract language
and questioned ODS's explanation of the meaning of "going
forward," it did not find the explanation unsustainable as a
matter of law.  Here, there is an ambiguous contract term and
two competing (and self-serving) explanations of what the
parties intended it to mean.  The factfinder will decide which
version is more credible and if MJC missed its opportunity to
legally terminate the agreement.

     2.  Section 3.2. (Non-competition)

     The proper meaning of Section 3.2 and its relationship to
Section 3.1 is also ambiguous.  ODS points out that Section

3.2, unlike Section 3.1, lacks any language that it is "subject to ODST achieving the Milestones."  MJC and Magna argue that MJC never would have attached a condition to the exclusivity clause but bound itself unconditionally in the provisions of the non-compete clause.  Interpretation of the non-compete provisions of Section 3.2 and the extent of their relationship to the exclusivity provisions of Section 3.1 hinges on the factfinder's conclusions regarding the parties' intent.  For this reason, summary judgment will also be denied on the Section 3.2 claims.

The alleged breaches of Sections 3.1 and 3.2 also must be further delineated to address two specific time periods. First, ODS alleges that MJC breached when it terminated the contract in 2003.  If the factfinder concludes that MJC never waived the milestones and honored the notice provisions, MJC cannot be liable for that breach because it is undisputed that ODS never achieved the 48-month milestone, and MJC would thereby be able to terminate the contract without liability to ODS.  <u>See</u> Founders Agreement Article VI.  If, on the other hand, MJC had waived Article VI before it terminated the contract, it would be liable for all damages it caused to ODS through the remainder of the contract's original term. Second, there is the allegation that MJC breached Sections 3.1

13

and 3.2 by sharing its broadcast signal from the date of the
agreement, December 11, 1997, until it terminated the
contract.  If the factfinder determines that achieving the 48-
month milestone was not a condition precedent to full
enforcement of the exclusivity and non-compete clauses, MJC
would be liable for damages the factfinder traces to those
breaches.

> ### 3.  Article VIII (Confidentiality)

Article VIII of the Founders Agreement clearly binds the
parties not to disclose each other's confidential information
"to any third party without the prior written consent of the
other."  Founders Agreement, Article VIII(b).  It is
undisputed that MJC disclosed ODS's confidential information
to Magna, ODS's competitor, prior to Magna's purchase of the
controlling interest in MJC stock.  <u>See</u> Hannah Depo. at 138-
40.  Unless the jury finds that ODS waived Article VIII, MJC
would be liable for any damages that the factfinder traces to
this breach.

MJC and Magna argue that MJC is not liable for breach of
the confidentiality provision because ODS has failed to
adequately allege causation or harm stemming from the breach.
They assert further that ODS silently assented to the sharing
of its information by failing to raise any concerns with MJC

14

during the purchase and in the months afterwards.  They also add that ODS must have violated the same provision when TV Guide, Inc. (TV Guide) purchased an ownership interest in ODS in 1998 and again in 2000 when Gemstar acquired TV Guide.

MJC's justifications are insufficient to withstand ODS's cross-motion for summary judgment on this issue, unless ODS waived the provisions by its conduct.  <u>See</u> <u>supra</u> Part III-B-1 (discussing waiver).  ODS has proferred expert testimony explaining how it has been harmed by MJC's contract breaches, and MJC and Magna have put forth no evidence to substantiate their assumption that ODS has engaged in similar behavior in violation of Article VIII.  A reasonable juror could permissibly find that MJC's breach of Article VIII in 2002 played a significant role in ODS's termination in 2004 and in ODS's overall economic damages.  The issues of causation and damages in this instance are not subject to resolution as a matter of law.

### 4.  Section 9.3 (Anti-assignment)

Section 9.3 states "Neither this Agreement nor any of the rights or obligations of either party hereunder may be assigned . . . without the prior written consent of the other."  It immediately follows with "[a]s used in this Section 9.3, the term 'assignment' includes any transaction

that results in a change in control of MJC or ODST . . . ."
It is undisputed that the sale of MJC to Magna represented a
change in control of MJC to which ODS did not consent.  <u>See</u>
Hannah Depo. at 153.  Unless the jury finds that ODS waived
section 9.3, MJC will again be liable for any damages that the
factfinder determines flow from this breach.

The contractual definition the parties give the word
"assignment" is unambiguous here.  Under Delaware law, a
contract's unambiguous terms are given their "ordinary and
usual meaning."  <u>See</u> <u>Rhone-Poulenc Basic Chemicals Co. v.</u>
<u>American Motorists Ins. Co.</u>, 616 A.2d 1192, 1196 (Del. 1992)
("Courts will not torture contractual terms to impart
ambiguity where ordinary meaning leaves no room for
uncertainty."); <u>see also</u> <u>Pellaton v. Bank of New York</u>, 592
A.2d 473, 478 (Del. 1991) (stating where contract is "clear
and unambiguous on its face, neither this Court nor the trial
court may consider parol evidence 'to interpret it or search
for the parties' intent[ions]'") (citation omitted).  This
Court will therefore adhere to the ordinary meaning of "any
transaction that results in a change in control of MJC" in
determining whether MJC breached Section 9.3.

In arguing that the stock sale cannot be considered an
assignment, MJC and Magna's citations to the Restatement

16

(Second) of Contracts and Delaware case law are unpersuasive.

Section 322(1) of the Restatement begins "unless the

circumstances indicate the contrary," before explaining that

the scope of a typical anti-assignment clause merely bars

delegation of performance.  Here, the circumstances do

indicate a contrary meaning of "assignment" because the

parties have stipulated to a specific and unambiguous

definition that differs from the customary definition (making

that definition's presence in the contract that much more

controlling).  In <u>Branmar Theatre Co. v. Branmar, Inc.</u>, after

stating that a sale of controlling stock normally does not

constitute assignment, the Chancery court notes that where

parties want a stock sale to be construed as an assignment,

they need only to "express [that wish] in the lease in clear

and unequivocal language."  264 A.2d 526, 528 (Del. Ch. 1970);

<u>see also</u> <u>Baxter Pharmaceutical Products, Inc. v. ESI Lederle</u>

<u>Inc.</u>, 1999 WL 160148, *5 (Del. Ch. March 11, 1999) (stating

same).

MJC and Magna argue that, because ODS participated in a

similar sale of its controlling stock without seeking consent

from MJC and did not complain of the Section 9.3 breach until

long after the sale to Magna was completed, the Court cannot

construe MJC's conduct as a breach of Section 9.3.  They add

that even if a breach occurred, there is an insufficient
showing of causation or harm to withstand summary judgment.

The essence of these arguments is that mutual breach and
waiver excuse MJC's non-compliance with Section 9.3.
Regarding the mutual breach claim, the Court considers it
significant that both parties continued to perform, at least
partially, under the contract until 2004, despite claims of
material breaches in 1998, 2000, 2001, and 2002.  Under such
circumstances, their respective claims that each other's
breaches excuse their own performance ring somewhat hollow.
See, e.g., Cary Oil Co., Inc. v. MG Refining and Marketing,
Inc., 90 F. Supp. 2d 401, 409 (S.D.N.Y. 2000) (stating "if the
party aggrieved by a material breach elects not to terminate,
the breach is deemed partial, and the contract remains in
force") (applying New York law but citing, inter alia,
RESTATEMENT (SECOND) OF CONTRACTS § 236 cmt. b.)  The question,
however, of whether ODS waived the anti-assignment clause by
its conduct is for the jury.  See supra Part III-B-1
(discussing waiver).

The same causation and harm analysis for the Article VIII
claim, supra Section III-B-3, applies to the Section 9.3
claim.  ODS offers some evidence that it has been harmed by
MJC's contract breaches.  A reasonable jury could find that

18

breaching the anti-assignment clause in 2002 played a significant role in ODS's termination in 2004 and in ODS's overall economic damages.  The question of causation and damages therefore belongs to the jury.

### C.  Breach of contract by ODS

Under the August 1997 letter agreement, MJC is entitled to one-sixth of a percentage interest in ODS each time it completes one of three specific objectives.[3]  In the Letter Agreement of April 28, 1999, ODS agreed to "promptly document the one-half percent (½%) ownership interest on the terms offered to MJC" in the August 1997 letter agreement.  In 2001, ODS was deployed in Maryland,[4] thereby meeting the first performance goal.  ODS argues that, notwithstanding ODS's

---

[3]  The provision states "ODS will offer [MJC] a 1/2% ownership interest in ODS based on performance of the following items:
   1.  ODS/TVG deployment in Maryland
   2.  ODS/TVG deployment in Virginia
   3.  Awarding ODS the exclusive home wagering rights on the Preakness

"One third of MJC's 1/2% interest will be earned for completion of each performance milestone."

[4]  In their reply, Magna and MJC assert that deployment occurred in 2001.  Reply at 25.  In its cross-motion, ODS states it "entered the Maryland market in October 1999." Cross-motion at 29.  To the extent deployment and entering a market may be functionally equivalent, the possible discrepancy does not change the Court's analysis.

deployment in Maryland, MJC is not entitled to the ownership interest because MJC has materially breached the contract's exclusivity, non-compete, anti-assignment, and confidentiality provisions.  MJC and Magna note that three of those alleged breaches necessarily occurred after the 2001 deployment, undercutting ODS's justification for non-performance.[5]  The parties devote relatively little argument to this issue and their even more limited citation to case law is not particularly instructive.

As explained more fully in Section III-B-4, <u>supra</u>, the continued performance of both parties after 2001 prevents ODS from credibly arguing that MJC's partial breaches excused ODS from performing this part of the contract.  The Court finds that MJC and Magna are entitled to summary judgment as to liability on their claim for breach of the ownership interest provision of the August 1997 letter agreement.  The calculation of damages flowing from this breach will be made by the jury.

### D.  Tortious interference with contract by Magna

ODS alleges that Magna tortiously interfered with the

---

[5]  In its June 13, 2003, letter to MJC, ODS also stated that MJC could only earn its ownership interest by meeting all three of the performance goals.  It has not made that argument, however, in its pleadings.

Founders Agreement by inducing MJC to breach several of its provisions.  Under Maryland law, the elements of tortious interference with contract are: "(1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff." havePOWER, LLC v. General Electric Co., 183 F. Supp. 2d 779, 784 (D. Md. 2002) (citation omitted).  "In order to prove the third element of the tort, plaintiff must prove that the interference was wrongful and without justification."  Id. (citation and internal quotation marks omitted).

Of great significance to ODS's claims against Magna for tortious interference with contract is whether the Founders Agreement was terminable at will.[6]  When delineating which interfering behaviors are tortious, Maryland law makes a substantive distinction between fixed contracts and those terminable at will.  See Natural Design, Inc. v. Rouse Co., 485 A.2d 663, 674 (Md. 1984) ("[W]here a contract between two parties exists, the circumstances in which a third party has a

_____

[6]   The Court rejects ODS's interpretation of Delaware law that because contracts of indefinite duration are terminable at-will, this contract (with a definite term) necessarily cannot be terminable at-will.

21

right to interfere with the performance of that contract are
more narrowly restricted.  A broader right to interfere with
economic relations exists where no contract or a contract
terminable at will is involved.").  A sustainable claim of
tortious interference with a contract terminable at will
requires "both a tortious intent and improper or wrongful
conduct." <u>Macklin v. Robert Logan Associates</u>, 639 A.2d 112,
119 (Md. 1994) (citing, <u>inter alia</u>, RESTATEMENT (SECOND) OF TORTS §
766B).  The Court of Appeals adds that where a contract is
terminable at will, "interference with another's contract or
business relations in the name of competition is improper only
if the means used are, in themselves, improper." <u>Id.</u> (noting
value of economic competition to general welfare of society).
That same court cautions, however, that "[w]hen the existing
contract is not terminable at will, inducing its breach, even
for competitive purposes, is itself improper and,
consequently, not 'just cause' for damaging another in his or
her business." <u>Id.</u> at 120.

While a cursory review of <u>Macklin</u> and the Restatement
might lead one to conclude that economic competition typically
justifies any non-egregious actions that induce the breach of
a contract terminable at will, a closer reading shows that
economic competition only justifies inducing the <u>termination</u>

of that contract.  The induced breach alleged in <u>Macklin</u> was
merely the termination of a lease terminable at will; it was
therefore justified by economic competition.  Likewise, the
Restatement section specifically dedicated to the
(im)propriety of economic competition in the context of
tortious interference with contract explains in its comments
on contracts terminable at will why competition does not rise
to the level of improper interference with those contracts:

> If the third person is free to terminate his
> contractual relation with the plaintiff when he
> chooses, there is still a subsisting contract
> relation; but any interference with it that <u>induces
> its termination</u> is primarily an interference with
> the future relation between the parties, and the
> plaintiff has no legal assurance of them.  As for
> the future hopes he has no legal right but only an
> expectancy; and <u>when the contract is terminated</u> by
> the choice of the third person <u>there is no breach</u> of
> it.  The competitor is therefore free, for his own
> competitive advantage, to obtain the future benefits
> for himself by causing<u> the termination</u>.

RESTATEMENT (SECOND) OF TORTS § 768 cmt. i. (emphases added).  The
underlying rationale for allowing economic competition to
justify termination of an at-will contract is that the
terminated party holds an interest primarily "in future
relations" making the alleged tort "closely analogous to
interference with prospective contractual relations;" <u>i.e.</u>, a
contract that does not even exist.  <u>Id.</u> § 766 cmt. g.; <u>see</u>

<u>also</u> <u>Macklin</u>, 639 A.2d at 120 (noting "broader right to interfere" where contract is "terminable at will by the party who refuses to continue performance" and stating no impropriety where competitor induces termination by third party who solely holds "decision whether to terminate or continue a contract").

<u>1.  Tortious interference by Magna with MJC's obligations under the exclusivity and non-compete provisions of Sections 3.1 and 3.2.</u>

As explained above, whether the Founders Agreement was terminable at will when MJC terminated hinges largely on whether MJC waived the milestones, which is a question of fact for the jury.  If the contract was terminable at will when MJC terminated, Magna is not liable for tortious interference based upon MJC's termination of the contract.  If MJC waived the milestones, then it will be for the jury to decide if Magna's actions here constituted improper inducement of the breach as well as any possible damages that would flow from a finding of improper inducement.  <u>See</u> RESTATEMENT (SECOND) OF TORTS § 767 cmt. l. (explaining function of jury in deciding defendant's intent and propriety of interference).

Beyond improper inducement of termination, ODS also asserts that Magna improperly induced MJC to breach Sections

3.1 and 3.2 by sharing its broadcast signal from the date of the 48-month milestone (November 1, 2001) until Magna's acquisition of MJC.[7]  As stated above, MJC can be liable for damages that the factfinder traces to those breaches. Similarly, it will be for the jury to decide if Magna's actions in this time period constituted improper inducement of MJC's breach as well as any possible damages that would flow from a finding of improper inducement.

While the Court accepts MJC and Magna's argument that under the facts here and the _Macklin_ opinion, Magna cannot be liable for MJC's termination of the contract if the contract is terminable at will, it does not accept their assertion that Magna is at liberty to do anything short of unlawful activity to induce independent breaches before its termination.[8]  _See_

---

[7]  Magna is not liable for tortious interference after it acquired MJC.  _See_ December 30, 2003, Mem. at 4-12 (granting summary judgment to Magna on tortious interference claims for actions it was alleged to have taken after acquiring MJC due to parent corporation's authority to interfere in the contracts of its subsidiaries).  The Court, however, declines MJC and Magna's invitation to expand the doctrine protecting parent corporations to cover prospective purchasers of subsidiaries.

[8]  Particularly disconcerting to the Court is that MJC and Magna twice proffer an incorrect citation to _Macklin_, with a self-serving quote that simply does not appear anywhere in the opinion.  _See_ MJC and Magna's Summary Judgment Mem. at 2; Supp. Opp. at 4.  The latter states:

> Under well-established Maryland law, ODST cannot
> prove tortious interference with the Founders

Macklin, 639 A.2d at 119 (stating instead, "conduct that is quite subtle, nevertheless, can be improper or wrongful" even in the context of an interference with prospective contractual relations claim).

Similarly, the Court rejects MJC and Magna's contention that no reasonable factfinder could conclude that Magna had the requisite intent for the tort of intentional interference with contractual relations.  See RESTATEMENT (SECOND) TORTS § 8A (stating "[t]he word 'intent'" merely denotes "that the actor

---

Agreement where the Agreement is terminable-at-will, unless ODST establishes that Magna used "unlawful means." *See Macklin v. Robert Logan Assocs.*, 334 Md. 287, 639 A.2d 112, 117 (1994) ("In order to establish a claim for tortious interference with a contract that is terminable-at-will, the plaintiff must show that the defendant used 'unlawful means.' Such means include such conduct as 'violence, intimidation, defamation, injurious falsehood or other fraud'").

Where a party seeks to quote controlling law on a point of great significance to the just resolution of the dispute, the Court requires the utmost fidelity to the actual language used by the Maryland Court of Appeals. Not only does the parenthetical quote attributed to Macklin not appear within the opinion, but the Court also finds language far less favorable to MJC and Magna in its place. See, e.g., id. at 117 (liability where no contract exists and one "maliciously or wrongfully infringes"); at 119 (liability for "tortious intent and improper or wrongful conduct," which is "incapable of precise definition"). Only when recapitulating appellants' understanding of the law does the court use the phrase "requirement that the interference must have been wrongful or unlawful," which is substantially different than the language MJC and Magna set forth. Id. at 118.

desires to cause consequences of his act, or that he believes
that the consequences are substantially certain to result from
it"). Under Maryland law, in the context of tortious
interference with contract claims, "it is not necessary that
the actor appreciate the legal significance of the facts which
give rise to the contractual duty. If he knows those facts,
he is subject to liability even though he is mistaken as to
their legal significance and believes that there is no
contract or that the contract means something other than what
it is judicially held to mean." <u>Stannard v. McCool</u>, 84 A.2d
862, 867 (Md. 1951) (internal quotation omitted). The record
is clear that, even after studying the Founders Agreement,
Magna still accepted MJC's broadcast signals.[9]

   <u>2.  Tortious interference by Magna with MJC's obligations
under the confidentiality clause of Article VIII.</u>

   As fully explained above, MJC breached Article VIII, and
it will be for the jury to decide if Magna induced that breach
by improper means. The question of damages is also for the

_____

   [9] The record is equally clear that, after studying the
Founders Agreement, Magna requested ODS's proprietary
information and sought the change in control of MJC's
ownership without ODS's consent. In so doing, and contrary to
MJC and Magna's assertions, it has provided a factual basis
from which a reasonable factfinder could conclude that it had
the requisite intent to induce the breaches of Article VIII
and Section 9.3.

jury.

3.  Tortious interference by Magna with MJC's obligations
under the anti-assignment clause of Section 9.3.

Likewise, the jury may find that MJC breached Section
9.3, and it would be for the jury to decide if Magna induced
that breach by improper means.  The question of damages
remains with the jury.

IV.  CONCLUSION

For these reasons, ODS's cross-motion for partial summary
judgment will be denied and MJC and Magna's motion will be
granted in part and denied in part as follows.  First, the
alleged breaches of Sections 3.1, 3.2, Article VIII, and 9.3
will be resolved by a jury.  The jury also will decide if
damages are to be awarded pursuant to these breaches.  Second,
MJC and Magna are entitled to summary judgment as to ODS's
breach of the ownership interest provision with damages to be
determined by the jury.  Third, summary judgment will be
denied to both sides regarding ODS's claims against Magna for
tortious interference with contract.  A separate order
consistent with the reasoning of this Memorandum will follow.

_____/s/_____
William M. Nickerson
Senior United States District Judge

28

Dated: May 20, 2005